UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

ANITA ROBINSON,

      Plaintiff,

      v.

THE COMMONWEALTH OF
PENNSYLVANIA, OFFICE OF
ATTORNEY GENERAL,

      Defendant.

CIVIL ACTION NO. 22-CV-1704

(SAPORITO, J.)

## MEMORANDUM

This case, removed to the United States District Court for the Middle District of Pennsylvania, alleges federal claims for race and color discrimination under 42 U.S.C. § 2000e-2 and state law claims of race, color, and age discrimination under the Pennsylvania Human Relations Act, 43 P.S. § 944(a).

## I.  Background

The plaintiff in this action is Anita Robinson. The defendant in this action is the Commonwealth of Pennsylvania Office of the Attorney General ("OAG"). The plaintiff alleges federal claims for race discrimination and state law claims for race and age discrimination for her termination by OAG from her Human Resources Analyst III position

and OAG's subsequent refusal to allow her to apply for a new Human Resource Analyst III position posted after that termination.

The plaintiff, an African American female, was hired by the OAG on September 7, 1999, as a Computer Systems Analyst I. On June 21, 2004, the plaintiff was promoted to a Human Resource Analyst III position in OAG's Human Resources division. She held that job title throughout the remainder of her employment. On April 13, 2021, the plaintiff's supervisors called a remove video Webex meeting with the plaintiff where they informed her that she would be terminated effective immediately due to a restructuring of her Human Resources division. The restructuring consisted of consolidating the plaintiff's Human Resource Analyst III position with that of another employee, Erika Nale, into a singular Human Resource Analyst III position that encapsulated duties from both prior positions. On April 19, 2021, unbeknownst to the plaintiff, OAG posted the new Human Resource Analyst III position on its website. On June 22, 2021, OAG offered the position to Vania Tonelotti. She was officially appointed by then Attorney General Josh Shapiro[1] on July 7, 2021.

---

[1] Josh Shapiro is now the Governor of Pennsylvania.

On September 26, 2022, the plaintiff filed this action in the Dauphin County Court of Common Pleas, alleging federal claims for race and color discrimination under 42 U.S.C. § 2000e-2 and state law claims of race, color, and age discrimination under the Pennsylvania Human Relations Act, 43 P.S. § 944(a). The case was then removed to the United States District Court for the Middle District of Pennsylvania. The parties engaged in a period of discovery, and on July 7, 2025, the parties appeared before the undersigned United States district judge for a bench trial. The trial consisted of three days and ended on July 9, 2025.

## II.   Discussion

The plaintiff believes that her termination, and OAG's subsequent refusal to allow her to apply for the newly consolidated position, resulted from race and age discrimination. OAG contends that the plaintiff's termination resulted from a restructuring of the Human Resources division in which she worked, further asserting that she would not have been a suitable fit for the new Human Resources Analyst III position. For relief, the plaintiff seeks back pay, front pay, and compensatory damages. Both parties also seek an award of costs and attorney fees.

## A. Evidence Received Into the Record

### 1. *Testimony of Anita Robinson*

The plaintiff presented the testimony of Anita Robinson, the plaintiff in this action who was terminated by OAG in April 2021. The plaintiff testified that although she was originally hired at OAG as a software trainer in 1999, she was promoted to a Human Resources Analyst III in 2004, a position that she worked in before the termination leading to this action. The plaintiff testified that since 2013, when OAG began to give annual performance reviews, she had received only "Commendable" and "Satisfactory" ratings, and that she had never been given any discipline pursuant to OAG's discipline policy. Moreover, she testified that she had never been given a performance improvement plan by OAG to address any concerns with her work performance. The plaintiff also testified that she had obtained numerous work certifications throughout her employment as a Human Resources Analyst III to help advance her qualifications for her position.

The plaintiff testified to the makeup of the Human Resources team at OAG. She explained that there were five or six additional members of the HR team, other than herself, and that all of them were Caucasian

and significantly younger. The plaintiff testified that her and her team's offices were originally located within the same vicinity, but at some point, her and another employee's office was relocated to a different location that was separated from the remaining team members. She further testified that the other employee was reassigned to the original office location, leaving her as the only isolated team member. She explained that the separation made her feel disappointed and humiliated as the only African American woman on her team.

The plaintiff detailed a story about a fellow African American employee at OAG, Tommy Rainey, who spoke to the plaintiff about an event where a Caucasian employee called him, "Boy." She testified that Mr. Rainey told her that he felt discriminated against by being referred to as "Boy" and told the plaintiff that this name usage had occurred repeatedly. The plaintiff further testified that Mr. Rainey filed a discrimination complaint with OAG, but to her knowledge, the incident was never investigated. In response to Mr. Rainey's complaint, the plaintiff testified that she sent her supervisor an email reminding the office that employees like Mr. Rainey should be called by their name, not "Boy" or "Girl."

The plaintiff testified about the circumstances surrounding her termination on April 13, 2021. She testified that she was asked to attend a virtual meeting with her supervisors, Shari McGraw and Jodi Lobel, and that they informed her that she was being terminated due to a restructuring of the Human Resources division. She testified that she was never informed about the creation of the newly consolidated Human Resource Analyst III position, and that she had no awareness that the position had been posted on OAG's website until someone was hired for the position. After reviewing the qualifications and duties expected from the new Human Resource Analyst III position, the plaintiff testified that she felt her experience and familiarity with the role made her confident in her ability to perform its duties.

The plaintiff testified that after her termination, she struggled to find a job. She testified that after unsuccessfully applying to state jobs and jobs in the private sector for three years, she finally found employment as a substitute schoolteacher in April of 2023. However, she explained that she does not receive any employment benefits from the job. She further explained that her job as a substitute schoolteacher comes with a severe pay cut and does not include medical, dental, or life

insurance. Moreover, the plaintiff testified that OAG terminated her employment right before she was eligible for the Commonwealth of Pennsylvania's superannuation retirement system, which pays employees a payout if they reach a certain age and years of service with the Commonwealth. She testified that she was dependent on that payout for retirement, and due to her early termination and struggles to find a job, she was forced to receive her social security benefits early to supplement her lower income from the substitute schoolteacher job.

On cross examination, the plaintiff testified that while she had familiarity with Ms. Nale's duties, she did not have direct experience with those duties. The plaintiff further testified that she did not share any duties with the other members of the Human Resources department. The plaintiff clarified that while her office was relocated away from the other members of her team, she could not recall when that transition occurred. She also acknowledged that while she did receive "Satisfactory" and "Commendable" ratings in her annual performance reviews, those reviews additionally contained constructive criticism and identified areas for the plaintiff to improve her work performance. Finally, the plaintiff reiterated that to the best of her knowledge, Mr. Rainey's complaint of

- 7 -

race discrimination was never investigated, adding that she did not investigate the complaint despite being part of her job duties.

On redirect examination, the plaintiff explained why she did not investigate Mr. Rainey's complaint. She testified that Ms. McGraw would normally give the plaintiff instructions on how to proceed with an investigation. The plaintiff articulated that in this case, Ms. McGraw never explained how to proceed with the investigation, and therefore, she could not investigate it. The plaintiff also reiterated that her annual performance review ratings were always "Satisfactory" and "Commendable" despite any comments identifying any potential areas of progress.

Overall, we find Ms. Robinson to be a credible witness.

### 2. Testimony of Shari McGraw

The plaintiff presented the evidence of Shari McGraw, OAG's Director of Human Resources and Office Services. Ms. McGraw confirmed that she was the plaintiff's supervisor in the years leading up to the plaintiff's termination in 2021. She testified that there were nine human resource employees that reported to her, and that the plaintiff was the oldest member, and the only African American member, of the

team. Ms. McGraw testified to OAG's policy concerning annual performance evaluations for its employees and testified to OAG's employee discipline policy. She testified that to the best of her knowledge, the plaintiff had never received any written or formal complaints concerning her work performance and she had only received "Satisfactory" or "Commendable" ratings on her annual performance reviews.

Ms. McGraw testified to Mr. Rainey's complaint about race discrimination. She testified that Mr. Rainey sent her an email regarding an OAG employee's use of the term, "Boy." Ms. McGraw testified that at the time of the complaint, she did not know that the use of the term "Boy" had racial undertones. She testified that the investigation was assigned to OAG's operations counsel and that the investigation concluded that the term "Boy" was collectively used to a group of male employees in the mailroom. Ms. McGraw further explained that the employee apologized to Mr. Rainey once she was informed that its use could be considered derogatory.

Ms. McGraw testified to the process of restructuring the plaintiff's and Ms. Nale's positions into one position, and confirmed that the new

Human Resources Analyst III position combined the duties of the previous positions. She testified that she and Ms. Lobel terminated the plaintiff from OAG by remote video on April 13, 2021. Ms. McGraw explained that OAG offered both Ms. Nale and the plaintiff a severance agreement and release that prevented any party signing that agreement from applying for employment with OAG in the future. She testified that the plaintiff would only be barred from applying to the new position if she had signed the agreement, and at the time of the posting of the new position, she had no idea whether the plaintiff had signed the agreement and release. Ms. McGraw confirmed that she never mentioned the new Human Resources Analyst III position or its posting to the plaintiff. She testified that she did not reach out to the plaintiff about the position because she felt the plaintiff was not the best candidate for the job.

Ms. McGraw testified as to the process in hiring Vania Tonelotti for the new Human Resources Analyst III position. Ms. McGraw testified that Ms. Tonelotti was hired approximately two months after the plaintiff's termination, and that the hiring process consisted of two rounds of interviews. She testified that Ms. Tonelotti was not the only applicant for the position. She admitted that even though OAG hired Ms.

Tonelotti for the position, many members of the interview panels, including herself, thought that Ms. Tonelotti would require training in some areas of the job and believed that she did not have the requisite experience for some of the duties in her position.

On cross examination, Ms. McGraw further testified as to her knowledge of the investigation of Mr. Rainey's complaint. She testified that she asked the plaintiff to look into the complaint, but the plaintiff sent her an email explaining that there were no "Boys" or "Girls" in the office rather than agreeing to follow up with the investigation. Ms. McGraw testified that she assumed that the plaintiff had already made up her mind before investigating the matter and so she forwarded the investigation to OAG's operations counsel instead.

Ms. McGraw testified that as early as 2016, there were conversations concerning problematic aspects of the plaintiff's work performance, specifically the plaintiff's failure to take initiative on investigations. She further explained that certain aspects of the plaintiff's duties became automated, such as changing passwords. Moreover, Ms. McGraw testified that the plaintiff was never barred from applying for the new Human Resource Analyst III position. She testified

that she never told recruiters that the plaintiff could not apply or told them that they could not consider her for the position. Ms. McGraw also testified further to the plaintiff's relocation of her office, testifying that she moved the plaintiff and Ms. Nale to be closer to her office rather than to separate the plaintiff from the remaining team members.

On redirect examination, Ms. McGraw testified that she misspoke when previously testifying that she sent the plaintiff her final annual performance evaluation before her termination, clarifying that she must have sent it to the plaintiff after her termination. She further reiterated that the plaintiff only received "Satisfactory" or "Commendable" ratings, and identified a handwritten note that she wrote in 2019 or 2020, documenting that the plaintiff asked how she could develop additional skills in her position to better become accustomed to those seen in Ms. Nale's labor relations position. But Ms. McGraw was also questioned about her previous testimony, where she testified that she felt the plaintiff had no interest in investigating Mr. Rainey's complaint and therefore sent the investigation to OAG's operations counsel rather than having the plaintiff follow up on it. The plaintiff's counsel identified an email written by the plaintiff and sent to Ms. McGraw days after Mr.

Rainey filed his complaint of race discrimination, which asked Ms. McGraw about any updates to the investigation and what next steps the plaintiff should take pertaining to that investigation. The plaintiff's counsel then asked Ms. McGraw why the plaintiff would follow up about the investigation if the plaintiff knew that it was being investigated by OAG's operations counsel. Ms. McGraw did not have an answer to that question. The Court then followed up and asked Ms. McGraw the same question. She still did not have an answer.

On recross examination, Ms. McGraw testified that to her knowledge, the investigation by OAG's operation counsel was completed by April of 2021, but that she did not know the exact date for when it concluded. Moreover, she testified again that OAG originally planned to add a new position to the Human Resources division as a supplement to the plaintiff's and Ms. Nale's positions, but after OAG was forced to cut positions due to the COVID-19 pandemic, it decided to consolidate the positions instead.

Overall, we find Ms. McGraw's testimony to be partially credible. We find her testimony credible to OAG's need for restructuring, but not credible as to the reasonings for Ms. Robinson's termination and her fit

for the new Human Resources Analyst position.

### 3. Testimony of Vania Tonelotti

The plaintiff presented the testimony of Vania Tonelotti, the employee that was hired for the new Human Resource Analyst III position. Ms. Tonelotti testified to the application process which required her to submit her resume and three recommendations in support of her application. She testified that there were two rounds of interviews for the position. Moreover, Ms. Tonelotti testified to her professional background before applying for the Human Resource Analyst III position. She testified that she had some experience with the role's duties and was confident that she could perform those duties with which she was less familiar. Ms. Tonelotti confirmed that she received her offer letter for the position from OAG on June 22, 2021.

On cross-examination, Ms. Tonelotti testified to the differences between her previous jobs and her current job at OAG, specifically regarding investigations. She reiterated that she believed that she could perform many of the functions required by the Human Resources Analyst III job, and that her experience also allowed her to learn the duties quickly in which she lacked experience. Ms. Tonelotti also testified

generally to OAG's grievance procedure.

On redirect examination, Ms. Tonelotti testified that she had less experience with the plaintiff's previous duties than those of Ms. Nale's previous labor relations position. Ms. Tonelotti further testified that she agreed that she needed some training concerning some aspects of the new job.

Overall, we find Ms. Tonelotti's testimony to be credible.

### 4. Testimony of Nicole Kreiser

The plaintiff presented the testimony of Nicole Kreiser, the Human Resources director at the time of the plaintiff's termination. Ms. Kreiser testified that up until 2017, she was the plaintiff's supervisor and that she prepared some annual performance evaluations for the plaintiff. She further testified that her "Satisfactory" and "Commendable" ratings were reflective of the plaintiff's work performance. Ms. Kreiser also testified that the plaintiff showed a willingness to take on an active role in investigations.

Overall, we find Ms. Kreiser's testimony to be credible.

### 5. Testimony of Anthony Robinson

The plaintiff presented the testimony of Anthony Robinson, the

plaintiff's husband. Mr. Robinson testified that as a disabled veteran, he had not worked since 2020. He testified that the plaintiff had worked for OAG for approximately twenty-one years, and that she had begun talking about what life would be like once she was retired. Mr. Robinson testified that the plaintiff was blindsided about the firing, and that it affected their family mentally, physically, and financially. Mr. Robinson further testified that while the plaintiff became happier and more like her original self when she was able to land the substitute school job, he believes that the plaintiff's emotional state never truly recovered to what it was before she was terminated.

Overall, we find Mr. Robinson's testimony to be credible.

### 6. Testimony of Jodi Lobel

OAG presented the testimony of Jodi Lobel, who has worked as an executive deputy at OAG since August of 2017. Ms. Lobel testified that she began looking at a potential restructuring of the Human Resources division early on in her tenure. She testified that Ms. McGraw had created a memo preceding her employment about the possibility of restructuring the Human Resources division. Ms. Lobel testified that leading up to the restructuring, Ms. McGraw appeared to be working

multiple roles within OAG, including taking on many of the plaintiff's and Ms. Nale's responsibilities. Ms. Lobel explained that she and Ms. McGraw felt that the plaintiff and Ms. Nale were not fulfilling the needs of their positions and that their positions could be consolidated into a single position. Moreover, Ms. Lobel testified that she believed that the plaintiff's workplace performance had stagnated throughout the years and that she had trouble taking initiative in completing assignments. Therefore, Ms. Lobel testified that she made the decision to terminate the plaintiff and Ms. Nale from their positions and consolidate their positions into the singular Human Resources Analyst III position.

Ms. Lobel testified that she knew Ms. Tonelotti personally for many years before Ms. Tonelotti applied for the position. Ms. Lobel further testified that she reached out to Ms. Tonelotti about her interest in working with OAG generally before the new position was posted and before the plaintiff was terminated. She further explained that, despite the connection, Ms. Tonelotti's selection for the position was not predetermined.

On cross-examination, Ms. Lobel testified as to OAG's annual performance evaluation process. She testified that as Ms. McGraw's

supervisor, she would examine and sign off on any annual performance evaluation that was conducted by Ms. McGraw, and further testified that she reviewed and signed off on all the plaintiff's annual performance evaluations that were prepared by Ms. McGraw, rating the plaintiff as "Satisfactory" and "Commendable." But Ms. Lobel also explained that those evaluations contained many comments that identified areas of improvement in the plaintiff's work.

Ms. Lobel also testified to her knowledge of the race discrimination complaint by Mr. Rainey. She testified that Mr. Rainey had multiple performance issues with his work and that OAG had discussed furloughing his position due to a potential restructuring of the mailroom. Ms. Lobel also confirmed that Mr. Rainey had since retired.

Ms. Lobel testified to her knowledge of the hiring process of Ms. Tonelotti. She testified that she was on the second panel of the interview process, and that Ms. Tonelotti was highly recommended by her previous employer. Ms. Lobel also testified that Ms. McGraw gave a formal reference on behalf of Ms. Tonelotti for the position.

The Court then questioned Ms. Lobel about her association with Ms. Tonelotti. Upon examination, Ms. Lobel admitted that she could have

reached out to the plaintiff regarding the potential hiring for the newly created Human Resources Analyst III position. Moreover, when questioned about the annual performance evaluations, Ms. Lobel testified that OAG discourages giving employees low ratings if employees need improvement in certain areas of their work, running counter to the purpose of those reports reflecting honest feedback for employees. The Court again noted the inconsistencies between Ms. Lobel's alleged concerns with the plaintiff's work and her overall rating on every annual performance evaluation, especially when those evaluations contained positive feedback. Ms. Lobel also admitted that she never discussed many of her concerns with the plaintiff's work directly with the plaintiff.

Overall, we find Ms. Lobel's testimony to be partially credible. We find her testimony credible as to OAG's need for restructuring, but not credible as to the reasoning for Ms. Robinson's termination and her fit for the new Human Resources Analyst position.

### B. Exhibits Received Into Evidence

1.　Exhibit J-1: Initial Appointment Documents-Robinson

2.　Exhibit J-2: Human Resources Analyst Promotion Documents – Robinson

3.　Exhibit J-3: Notice of Separation – Robinson

4.      Exhibit J-4: Human Resources Analyst (Employee Relations Specialist) Job Posting

5.      Exhibit J-5: Initial Appointment Documents – Tonelotti

6.      Exhibit J-6: Performance Evaluation Report – Robinson [7/1/13 to 6/30/14]

7.      Exhibit J-7: Performance Evaluation Report – Robinson [7/1/14 to 6/30/15]

8.      Exhibit J-8: Performance Evaluation Report – Robinson [7/1/15 to 6/30/16]

9.      Exhibit J-9: Performance Evaluation Report – Robinson [7/1/16 to 6/30/17]

10.     Exhibit J-10: Performance Evaluation Report – Robinson [7/1/18 to 6/30/19]

11.     Exhibit J-11: Performance Evaluation Report – Robinson [7/1/19 to 6/30/20]

12.     Exhibit J-12: Management (Non-Attorney) Performance Evaluation System Admin Policy

13.     Exhibit J-15: Employee Disciplinary System Admin Policy

14.     Exhibit J-16: OAG's Response to Robinson's Interrogatories

15.     Exhibit J-18: Proposed Settlement Agreement and Mutual Release

16.     Exhibit J-19: Applicant Summary and Resume – Tonelotti

17.     Exhibit J-20: Waters Job Description [DEF2735-DEF2736]

18.     Exhibit J-21: Waters Job Description [DEF 2737-DEF2738]

19. Exhibit J-22: Robinson Job Description [DEF2733-DEF2734]

20. Exhibit J-23: Training Certification [JIEM]

21. Exhibit J-24: Training Certificate [EEOC]

22. Exhibit J-25: HR and OSS Org. Chart

23. Exhibit J-27: Job Search Documents 1 of 3

24. Exhibit J-28: Job Search Documents 2 of 3

25. Exhibit J-29: Job Search Documents 3 of 3

26. Exhibit J-30: Kelly Services USA, LLC 2024 W-2

27. Exhibit J-36: LinkedIn Profile – Tonelotti

28. Exhibit 37: Candidate Tally Form and Candidate Evaluation Forms – Tonelotti (Round 1)

29. Exhibit J-43: McGraw May 15, 2018 Memo *re*: Robinson

30. Exhibit J-44: Lobel Dec. 16, 2020 Memo *re*: Robinson

31. Exhibit J-45: McGraw Apr. 4, 2021 Memo *re:* Robinson

32. Exhibit J-50: Lobel Dec. 16, 2020 Memo *re*: Nale

33. Exhibit J-54: Deposition Transcript – Lobel

34. Exhibit J-58: McGraw Emails Jan-2021

35. Exhibit J-67: McGraw notes *re*: Robinson [DEF2776]

36. Exhibit J-68: McGraw handwritten notes *re*: Robinson [DEF2777]

37.    Exhibit J-69: McGraw handwritten notes *re*: Robinson [DEF2778]

38.    Exhibit J-72: McGraw handwritten notes *re*: Robinson's Accomplishments for 18/19 PER

39.    Exhibit J-73: McGraw handwritten notes *re*: Robinson [DEF2773]

40.    Exhibit J-74: Training Certificate [Criminal Investigations]

41.    Exhibit J-75: Training Certificate [Women & Leadership]

42.    Exhibit J-76: Training Certificate [Best Practices for Conducting SH Investigations]

43.    Exhibit J-81: Candidate Tally Form and Candidate Evaluation Forms – Tonelotti (Round 2)

44.    Exhibit J-82: Separation Information – Robinson

45.    Exhibit J-83: Kelly Services USA, LLC Payroll Statement

46.    Exhibit J-85: Authorization, Reference List and Reference Checks – Tonelotti

47.    Exhibit J-86: Email from Robel to Michelle Henry

## III.    Analysis

The plaintiff's race discrimination and age discrimination claims are both analyzed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The *McDonnell Douglas* burden-shifting framework consists of three steps.

First, a plaintiff must show a *prima facie* case of discrimination. *Id.* Next, if the plaintiff succeeds, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employer's [action]." *Id.* Finally, if the defendant satisfies its burden, the plaintiff must introduce evidence that the legitimate reasons offered by the defendant were a pretext for discrimination.

To show a *prima facie* case of discrimination under the first step of *McDonnell Douglas*, a plaintiff must establish she is: (1) a member of a protected class; (2) qualified for the position she sought to attain or retain; (3) suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *See Daniels v. Sch. Dist. of Philadelphia*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013), *aff'd*, 776 F.3d 181 (3d Cir. 2015). For age discrimination claims, a member of a protected class is an individual that "is forty years of age or older." *Mitchell v. City of Pittsburgh*, 995 F. Supp. 2d 420, 430 (W.D. Pa. 2014).

The plaintiff has brought her discrimination claims based on two of OAG's actions: (1) her termination; and (2) OAG's refusal to allow her to apply for the newly consolidated Human Resources Analyst III position.

However, based upon the testimony and evidence presented at trial, we find that OAG never refused to allow the plaintiff to apply for the new position. It is true that OAG never told the plaintiff that her position and Ms. Nale's position were being consolidated into a new position, and moreover, that OAG never informed the plaintiff that the position was going to be posted online shortly after her termination. But while OAG may not have been forthright with the plaintiff in its posting, the plaintiff was never expressly barred from applying for the position. The plaintiff did not sign OAG's agreement and release preventing her from applying for employment with OAG in the future, and OAG never told the plaintiff or OAG's employment recruiters that the plaintiff could not apply. Instead, it appears that the plaintiff could have applied for the position had she seen its posting. Unfortunately for the plaintiff, she did not. Therefore, because the record does not support the plaintiff's assertion that OAG refused to let her apply for the newly consolidated position, and there is no evidence that OAG was obliged to inform the plaintiff of the position, we find that the plaintiff's claims for race and age discrimination based upon that assertion fails. Accordingly, we are only left to analyze the plaintiff's claims concerning her termination.

Nonetheless, although OAG's concealment of the new position from the plaintiff does not, on its own, serve as a basis for her discrimination claims, we find that it is relevant to our analysis of her termination-based discrimination claims.

It is undisputed that the plaintiff is a member of a protected class for the purposes of her claims; she is African American and was 59-years-old at the time of her termination. Moreover, it is undisputed that the plaintiff's termination constitutes an adverse employment action.[2] The parties dispute whether the plaintiff was qualified for the new position and whether the termination occurred under circumstances that gave rise to intentional discrimination.

With respect to the plaintiff's qualifications, the parties agree that the new Employee Relations Specialist position combined the plaintiff's former position with Erika Nale's labor relations coordinator position. The OAG has a performance evaluation system that "provides an objective means of relating compensation to the performance of the

---

[2] Adverse employment actions include "all tangible employment actions 'such as hiring, *firing*, failing to promote, reassignment or a decision causing significant change in benefits.'" *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 73 (3d Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)) (emphasis added).

employee, and to encourage growth and development." Exhibit J-12. Each employee's supervisor performs an annual performance evaluation which is then discussed with the employee. From 2013 through her termination in 2021, OAG provided the plaintiff with an annual performance evaluation report assessing her overall performance with her Human Resources III job.[3] In each report, the plaintiff received an overall rating of "Commendable"[4] or "Satisfactory,"[5] demonstrating that, from 2013 through 2021, OAG consistently found that she met or exceeded her job expectations. Accordingly, these evaluations alone establish that she was fully qualified to perform the Human Resource Analyst III duties expected by the new role. But we also note that the plaintiff was never disciplined under OAG's employee disciplinary policy for poor performance or potential misconduct, and she was never placed on a performance improvement plan to address any alleged deficiencies in her

---

[3] All but one of the plaintiff's performance evaluation reports were provided by the parties. The parties did not provide an evaluation report for the plaintiff concerning the 2017-2018 time period.

[4] "Commendable" is defined as, "Employee meets and frequently exceeds the job expectation and standards and demonstrates a high degree of initiative, and quality of work of the employee's job in a full competent way." Exhibit J-6.

[5] "Satisfactory" is defined as, "Employee meets the expectations and standards of the employee's job in a fully competent way." Exhibit J-7.

work, further supporting her qualifications for her previous duties expected in the new Employee Relations Specialist position. Moreover, the plaintiff's extensive familiarity with Ms. Nale's labor relations coordinator position independently establishes her qualification for the expectations of that role in the Employee Relations Specialist position. The plaintiff worked alongside Ms. Nale for approximately five years, and she further testified that she worked in conjunction with Ms. Nale on union-related matters. In addition, she provided training to union employees as part of her responsibilities, which overlapped indirectly with her colleague's duties. At a minimum, her experience and exposure to these responsibilities established her qualifications to perform them in the new role. Based on the testimony and evidence presented at trial, we find that the plaintiff was qualified for the Employee Relations Specialist position.

The parties also disputed whether the plaintiff's termination occurred under circumstances that could give rise to an inference of intentional discrimination, as necessary under the fourth prong of *McDonnell Douglas*. Whether the termination gave rise to an inference of intentional discrimination depends on its classification—specifically

whether it was considered a "replacement" or due to a "reduction in force," an issue previously disputed by the parties. Under a "replacement" theory, the plaintiff must show that she was "replaced by another employee who was sufficiently younger [or of a different protected class] as to support an inference of a discriminatory motive." *Hartman v. Select Rehab., LLC,* 528 F. Supp. 3d 373, 383 (E.D. Pa. 2021). Under a "reduction in force" theory, the plaintiff must show "whether the employer retained employees not within the protected class." *Smith v. Thomas Jefferson Univ.,* No. 05-2834, 2006 WL 1887984, at *3 (E.D. Pa. June 29, 2006); *Matchko v. Kost Tire Distributors, Inc.,* No. 3:17-CV-01329, 2021 WL 1172991, at *4 (M.D. Pa. Mar. 29, 2021) (citations omitted). Based upon the testimony and evidence presented at trial, we conclude that the plaintiff's termination resulted from a reduction in force, not a replacement.

"A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company." *Matchko*, 2021 WL 1172991 at * 4 (quoting *Barnes v. GenCorp Inc.,* 896 F.2d 1457, 1465 (6th Cir. 1990)). "A reduction-in-force typically involves the layoff of many employees at once." *Id.* (citing

*Bearley v. Friendly Ice Cream Corp.*, 322 F. Supp. 2d 563, 575 (M.D. Pa. 2004). "A person is not replaced 'when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work.'" *Id.* (quoting *Bearley*, 322 F. Supp. 2d at 575). Here, the plaintiff's termination features all the characteristics of a reduction in force. OAG laid off two employees, the plaintiff and Ms. Nale, while consolidating many of the duties in their positions into a singular job: the Employee Relations Specialist position. The remaining duties were reassigned to the other members of the Human Resources division, who assumed them in addition to their preexisting responsibilities. The plaintiff testified that OAG notified her that her termination was the result of a "restructure" within OAG's Human Resources division. Accordingly, to satisfy the fourth element of *McDonnell Douglas*, the plaintiff must demonstrate that OAG retained employees who were not members of her protected class.

However, whether OAG retained employees outside of the plaintiff's protected class also turns on the characterization of her termination. Persons outside the protected class are considered those

employees who are "similarly situated," that is, they work in the same area in approximately the same position. *Anderson Consol. Rail Corp.*, 297 F.3d 242, 249-50 (3d Cir. 2002). The parties dispute which individuals should be considered the "similarly situated" individuals for this action. The plaintiff argues that the remaining human resource analysts on her team should be considered similarly situated for purposes of her termination, as they belonged to the same department and shared job titles throughout the plaintiff's employment. The plaintiff's interpretation satisfies the fourth prong of *McDonnell Douglas*, as the remaining team members were all younger Caucasian individuals. Therefore, OAG would have retained similarly situated individuals outside of the plaintiff's protected class. OAG disagrees with the plaintiff's categorization, contending that Ms. Nale, the employee terminated alongside the plaintiff, should be considered the only similarly situated party because both she and the plaintiff were terminated simultaneously and their positions were consolidated into a single role. Under this interpretation, the plaintiff would not satisfy the fourth prong of *McDonnell Douglas*, as the only similarly situated individual outside the plaintiff's protected class would have been

terminated, rather than retained, by OAG. Based upon the testimony and evidence presented at trial, we conclude that the similarly situated individuals are the remaining human resource analyst members, rather than just Ms. Nale. The plaintiff's team consisted of seven other human resource analysts, none of whom were African American and all of whom were significantly younger than the plaintiff. While the plaintiff was terminated and her position consolidated into a new role, some of her former duties were redistributed to the remaining team members outside her protected class. As a result, OAG retained six similarly situated employees outside the plaintiff's protected class while terminating the only non-Caucasian and older analyst. This action therefore occurred under circumstances that gives rise to an inference of intentional discrimination and satisfies the fourth prong of *McDonnell Douglas*.

Under the second step of *McDonnell Douglas*, once the plaintiff shows a *prima facie* case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's [action]." *McDonnell Douglas Corp*, 411 U.S. at 802. The plaintiff does not dispute that OAG's stated reason for the plaintiff's termination, the restructuring of the human resources department,

constitutes a legitimate and nondiscriminatory reason. Based on the testimony and evidence presented at trial, we agree. At trial, OAG staff members testified that the new Employee Relations Specialist position had originally been proposed in early 2020 as a supplement to the plaintiff's and Ms. Nale's roles. They further explained that the transition was interrupted by the COVID-19 pandemic, which prompted a shift in priorities and a reallocation of resources. As a result, OAG decided that the new position should combine the plaintiff's and Ms. Nale's duties, rather than merely supplement them, to improve the efficiency of the Human Resources department. We find this contention to be credible.

Therefore, under the third step of *McDonnell Douglas*, the plaintiff must introduce evidence that the legitimate reasons offered by the defendant were a pretext for discrimination. *McDonnell Douglas Corp*, 411 U.S. at 802. The Third Circuit has recognized that a plaintiff may demonstrate pretext by pointing to evidence allowing a factfinder to disbelieve the employer's reason for the adverse employment action. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (citing generally *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir.

1994)). The evidence must indicate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons. *Id.* at 644–45 (citing *Fuentes*, 32 F.3d at 765). Here, based upon the testimony and evidence presented at trial, while we find OAG's overall need for restructuring to be credible, we find that its reasoning for terminating the plaintiff, and subsequent concealment of the job posting, contain inconsistencies and contradictions that suggest the plaintiff's termination was attributed to discriminatory reasons.

OAG contends that it terminated the plaintiff, and concealed the existence of the newly consolidated position from the plaintiff, because it determined that she was not a good fit for the new Employee Relations Specialist position, which encompassed many of her previous duties. In support of its contention at trial, OAG pointed to comments in the plaintiff's prior annual performance evaluations that it argues demonstrate concerns regarding her work performance. Some examples include: (1) taking more initiative in the EEO process, *see* Exhibit J-9; (2) showing more empathy when listening to employee complaints or

concerns, *see* Exhibit J-10; and (3) failing to complete specific assignments timely, *see* Exhibit J-11. At trial, the plaintiff's supervisors testified that by April of 2021, they believed that the plaintiff had failed to improve upon those areas of concern and that they "need[ed] someone that can work at the HR Analyst III level, performing tasks more independently, taking initiative to determine action plans and next steps, and competently interview complainants and witnesses." Exhibit J-45. Accordingly, OAG maintains that the plaintiff's overall work performance justified her termination, as it concluded that she could not adequately perform the duties expected from the new Employee Relations Specialist position. However, in light of the testimony and evidence presented at trial, OAG's proffered justification is undermined by several material weaknesses.

First, despite its contentions that it had concerns about the plaintiff's work performance, OAG cannot reconcile those claims with the fact that the plaintiff received either "Satisfactory" or "Commendable" ratings throughout her tenure in her position, and never being rated as

"Needs Improvement"[6] or "Unsatisfactory."[7] Therefore, OAG's own evaluations determined that the plaintiff either fully met the expectations and standards of her job throughout her tenure, or that she frequently exceeded those expectations. Indeed, the plaintiff's most recent evaluation filled out mere days before her termination reflected these same ratings. *See* Exhibit J-11. In addition, although OAG highlights certain comments in the plaintiff's annual performance evaluations, those same evaluations likewise include positive observations regarding her performance. *See* Exhibit J-9 ("I feel you are a valuable employee."); Exhibit J-10 ("Anita has the required skills for all of her day-to-day tasks… Anita handles [those tasks] well."); Exhibit J-11 (Anita communicates well during new hire orientation, making our new hires feel welcomed to the OAG."). And as we noted above, the plaintiff never received any discipline under OAG's employee disciplinary policy for poor performance or potential misconduct concerning her

---

[6] "Needs Improvement" is defined as, "Employee meets many of the expectations of the job in a satisfactory manner, but often fails to adequately meet some of the expectations or standards, improvement is required." Exhibit J-10.

[7] "Unsatisfactory" is defined as, "Employee fails to meet many job expectations and standards. Performance deficiencies must be corrected." Exhibit J-10.

position, and additionally she never received an improvement plan under OAG's Performance Improvement Plan policy to improve upon any potential struggles. Accordingly, despite OAG's assertions, the plaintiff's consistent performance history undermines OAG's claim that it terminated her based on her work performance. The record indicates that the plaintiff was well qualified to perform the duties of the position.[8]

Moreover, OAG's decision to hire Vania Tonelotti for the newly consolidated position further calls into question its proffered justification. Beyond asserting that the plaintiff's performance in her prior role rendered her a poor fit, OAG also contends that she lacked experience in certain aspects of Ms. Nale's former position that were incorporated into the new role, and that this alleged deficiency factored into its determination that she was not qualified. However, OAG ultimately hired a new employee who had not performed many of the duties required for the position. Indeed, the plaintiff elicited testimony

---

[8] We also note that many of OAG's comments determining that the plaintiff was unfit for the newly consolidated job coincidentally occurred mere months before her termination. Moreover, some of those comments appear to be created in the same month that the plaintiff was terminated. These recent comments do not fit the plaintiff's satisfactory (or commendable) performance ratings regarding her duties seen in her annual performance evaluation reports.

that members of the hiring committee had voiced concerns about Ms. Tonelotti's lack of experience with those responsibilities. Accordingly, OAG's asserted concern about the plaintiff's lack of experience is undermined by its decision to hire a similarly inexperienced candidate, especially when the plaintiff had twenty-one years of overall experience working at the OAG with at least some familiarity with Ms. Nale's work duties.

Based on the testimony and evidence presented at trial, OAG's inconsistencies occur against a backdrop of circumstances indicating pretext for discrimination. We note again that the plaintiff was the only older and African American woman working in the Human Resources department, and she was terminated while six other Caucasian similarly situated employees remained at OAG. Moreover, for many years throughout her employment, the plaintiff's office was relocated and separated from the rest of the human resources staff, isolating her from the rest of the HR department.[9] The parties also testified to an event where an African American male mailroom employee filed a race

---

[9] Ms. Nale was originally moved with the plaintiff but only Ms. Nale was shortly moved back to the same location with all the other human resources employees.

discrimination complaint when a Caucasian OAG employee referred to him as "Boy," which he found extremely offensive and discriminatory. As a fellow African American, the employee confided in the plaintiff that the remark had been repeated on multiple occasions and that he felt offended and disrespected by its use. However, OAG opted not to allow the plaintiff to investigate the matter, despite her proactively reaching out to clarify whether she should handle the investigation. We find that these events constitute pretext for racial discrimination. The plaintiff also testified that she held certain retirement benefits that were dependent on her age and years of service, and that her pension increased in proportion to those years of service. She further testified that after twenty-one years of working at the OAG, she was terminated mere years before those retirement benefits accrued to maturity. We therefore find that the timing of the plaintiff's termination in combination with OAG's inconsistent justification for it serves as sufficient pretext for age discrimination.

## IV.    Findings of Fact and Conclusions of Law

For the foregoing reasons, we make the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil

Procedure. In accordance with these findings of fact and conclusions of law, the clerk will be directed to enter judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

### A. Findings of Fact

1.    On September 7, 1999, Anita Robinson[10], a Black African American female, was hired by the Commonwealth of Pennsylvania Office of Attorney General ("OAG") as a Computer Systems Analyst I.

2.    On June 21, 2004, Ms. Robinson was promoted to a Human Resource Analyst III position in the OAG Human Resources division. She held that job title throughout the remainder of her employment.

3.    In 2004, Ms. Robinson's work duties included: (1) designing the Human Resources website; (2) working with the State Employee Assistance Program; (3) ordering plaques for retiring employees; and (4) training agents.

4.    In 2014, Ms. Robinson assumed additional duties as an EEO Officer, which included: (1) serving as the first point of contact for EEO matters; (2) assigning the principal person responsible for employee and

---

[10] Ms. Robinson was formerly known as Anita Waters prior to her marriage.

labor relations matters; and (3) providing guidance for employees and managers to assist with performance, management, special projects, and general inquiries.

5. Ms. Robinson's duties included reviewing EEO complaints and participating in investigations.

6. In 2014, Nicole Kreiser, Director of Human Resources, was Ms. Robinson's supervisor.

7. As of late 2017, Shari McGraw, Direction of Human Resources and Office Services, became Ms. Robinson's supervisor.

8. Ms. McGraw reports to Jodi Lobel, Executive Deputy Attorney General of Operations, who oversees the Operations Division, including the Human Resources Department.

9. OAG has a progressive Employee Disciplinary Policy that includes several stages, including oral reprimand, written reprimand, suspension, and dismissal.

10. Ms. Robinson never received any discipline under the Employee Disciplinary Policy throughout her employment.

11. OAG has a Performance Improvement Plan Policy, the purpose of which is to set expectations for employees who are struggling

with their performance by outlining areas where they are struggling, and setting goals.

12. Ms. Robinson never received a performance improvement plan throughout her employment.

13. OAG has a Performance Evaluation System, that "[p]rovides an objective means of relating compensation to the performance of the employee, and to encourage employee growth and development," and "[r]ecognizes and rewards individual performances as an incentive for improving performance and efficiency."

14. OAG performance evaluation reports provide instructions for an evaluator: (1) Review with the employee the employee's job description, job standards (expectations/objectives/duties) to ensure the evaluation relates to the specific responsibilities, job assignments, and standards that were conveyed to the employee for the rating period; (2) Base the evaluation on the employee's performance during the entire review period, not isolated incidents or performance prior to or subsequent to the current review period. Obtain/review necessary input and supporting data; (3) Rate each factor in relation to the standards established and the guidelines listed on the form for each rating. An

outstanding rating should be reserved to recognize particularly high quality, excellent performance; (4) The comments sections should be used to: support performance ratings, indicate problem areas and provide guidance to employees on how to improve performance. Comments MUST be provided for unsatisfactory and outstanding performance ratings; (5) Discuss/obtain comments and signature/date of reviewing officer before the discussion/meeting with the employee; (6) Sign/date the form, meet with employee to discuss the evaluation, and obtain the employee's signature/date/comments. Arrange for reviewing office discussion if requested; and (7) Update with the employee the job description, essential job functions, and performance standards/objectives for the next rating period.

15.   Supervisors perform annual evaluations and discuss those evaluations with employees.

16.   There are five "Overall Rating" designations that an employee can receive in an annual performance evaluation: "Outstanding," "Commendable," "Satisfactory," "Needs Improvement," and Unsatisfactory.

17.   Throughout Ms. Robinson's twenty-one years of employment

at OAG, she received either "Satisfactory" or "Commendable" ratings in her performance evaluation reports.

18.    In her annual performance evaluation report for the period July 1, 2013, through July 30, 2014 ("2014 Review"), Ms. Robinson received an overall rating of "Commendable", defined as, "Employee meets and frequently exceeds the job expectation and standards and demonstrates a high degree of initiative, and quality of work of the employee's job in a full competent way."

19.    In her annual performance evaluation report for the period July 1, 2014, through July 30, 2015 ("2015 Review"), Ms. Robinson received an overall rating of "Satisfactory", defined, as "Employee meets the expectations and standards of the employee's job in a fully competent way."

20.    In her annual performance evaluation report for the period July 1, 2015, through July 30, 2016 ("2016 Review"), Ms. Robinson received an overall rating of "Commendable."

21.    In her annual performance evaluation report for the period July 1, 2016, through July 30, 2017 ("2017 Review"), Ms. Robinson received an overall rating of "Commendable."

22. The 2017 Review contained comments identifying both positive aspects about Ms. Robinson's performance and some constructive criticism concerning the plaintiff's performance.

23. There is no evidence that Ms. Robinson received an annual performance evaluation report for the period July 1, 2017, to June 30, 2018 ("2018 Review").

24. In her annual performance evaluation report for the period July 1, 2018, through June 30, 2019 ("2019 Review"), Ms. Robinson received an overall rating of "Satisfactory."

25. The 2019 Review contained comments identifying both positive aspects about Ms. Robinson's performance and some constructive criticism concerning the plaintiff's performance.

26. The 2019 Review was the last annual performance evaluation report provided to Ms. Robinson to sign during her employment.

27. Throughout her employment, Ms. Robinson participated in several training courses in human resource subject areas.

28. During her 2020 Review period, Ms. Robinson attended training with the Equal Employment Opportunity Commission to improve her EEO skills.

29. As of April 2021, Erika Nale, Caucasian, was the Human Resource Analyst III labor relations coordinator for OAG. She was thirty-nine years old and had been employed with OAG for approximately five years.

30. Ms. Nale only worked twenty-five hours per week.

31. Ms. Nale had no other roles at OAG besides her labor relations coordinator position.

32. There were occasions when Ms. Robinson worked in conjunction with Ms. Nale's predecessor on union matters.

33. There were occasions on which Ms. Robinson and Ms. Nale worked together on union matters.

34. There were occasions where Ms. Robinson was involved in investigations relating to union members, where Ms. Nale would conduct the investigation and Ms. Robinson would participate by being present and taking notes.

35. Ms. Robinson also provided EEO training for union employees as part of her job duties.

36. In January 2021, Tommy Rainey, a Black male OAG mailroom employee, made a race discrimination complaint that he was being

repeatedly referred to as "Boy," the most recent incident occurring in the mailroom where a Caucasian female employee approached him and called him "Boy."

37. Mr. Rainey also noted that his supervisor had repeatedly referred to him as "Boy."

38. Mr. Rainey found being referred to as "Boy" to be highly sensitive and offensive.

39. Mr. Rainey told Ms. Robinson directly that he was extremely offended and upset by the name, believing that it was racist, derogatory, and disrespectful.

40. It was obvious to Ms. Robinson that the repeated use of the word, "Boy," were racist remarks.

41. Ms. McGraw received an email directly from Mr. Rainey about his race discrimination complaint to which Ms. Robinson was also copied.

42. Ms. McGraw emailed Ms. Robinson that additional information would be needed about the context of Mr. Rainey's complaint to which Ms. Robinson responded, "Are there any boy/boys in the Attorney's General office? There are no boys/girls in our office, so therefore every employee should be addressed by his/her name. We can

gather more information but again every employee should be called by their name."

43.    Ms. McGraw claims that she did not know that calling a Black male, "Boy," was racist and derogatory.

44.    Ms. McGraw did not instruct Ms. Robinson to conduct any investigation regarding Mr. Rainey's complaint.

45.    Ms. McGraw directed Mr. Rainey's race discrimination complaint to OAG attorney Dan McGannon, Esq., for investigation.

46.    There is no evidence of any investigation report concerning Mr. Rainey's race discrimination complaint prepared by Mr. McGannon in the trial record.

47.    Three days after Mr. Rainey's email, Ms. McGraw's handwritten notes confirm that Ms. Robinson asked Ms. McGraw if she should continue the investigation of Mr. Rainey's race discrimination complaint.

48.    Ms. McGraw did not advise Ms. Robinson to continue the investigation.

49.    As of early April 2021, there were seven other Human Resource analysts that reported to Ms. McGraw, none of whom were

Black and all of whom were substantially younger than Ms. Robinson.

50.    For many years, Ms. Robinson's office was in the same area as the other Human Resource analysts.

51.    At some point, Ms. McGraw moved Ms. Robinson's office down the hallway and around the corner from all the other Human Resource analysts.

52.    Ms. Nale's office was originally moved to the same location as Ms. Robinson, but shortly after the move, Ms. Nale's office was moved back to the same location as the other Human Resource analysts, leaving Ms. Robinson isolated from her fellow employees.

53.    Ms. Robinson, as the only Black and oldest Human Resources employee, felt extremely upset by the move and felt discriminated against by being separated from her fellow employees.

54.    As of April 13, 2021, Ms. Robinson was fifty-nine years of age.

55.    On April 13, 2021, Ms. McGraw and Ms. Lobel called a remote video WebEx meeting with Ms. Robinson, where they informed her that she would be terminated effectively immediately.

56.    Ms. Robinson was informed that she would not be paid beyond April 13, 2021, and that her employment benefits would conclude at the

end of the month.

57.  Ms. Robinson was advised that the reason for termination was due to a "restructuring" of the Human Resources division.

58.  OAG's restructuring of the division was initiated at Ms. McGraw's suggestion, approved by Ms. Lobel, and then approved by Michelle Henry, the then First Assistant Attorney General.

59.  As part of the restructuring, OAG created a new Human Resource Analyst III position (Employee Relations Specialist) which combined many of Ms. Robinson's duties and Ms. Nale's duties. The remaining duties were disbursed to the remaining members of the Human Resources division.

60.  Ms. McGraw first presented the idea of a restructuring to Ms. Lobel in 2020, when Ms. McGraw proposed that the Human Resources division add an Employee Relations Specialist position to complement Ms. Robinson's and Ms. Nale's roles.

61.  Due to the COVID-19 pandemic, OAG delayed the implementation of the new Human Resources Analyst III position as it began to shift priorities due to a re-allocation of resources brought about by the pandemic.

62. Amidst the impact of the pandemic on OAG's Human Resources division, Ms. McGraw and Ms. Lobel discussed ideas and proposals to improve the efficiency of the division throughout 2020.

63. On December 16, 2020, Ms. Lobel recommended that OAG restructure the Human Resources division by terminating Ms. Robinson and Ms. Nale from their positions and consolidating those positions into a single position.

64. Ms. Robinson and Ms. Nale were both offered a Settlement Agreement and Release by OAG with a no re-employment term preventing either of them from applying for a position at OAG in the future.

65. Ms. Nale signed the Settlement Agreement and Release; Ms. Robinson did not.

66. Neither Ms. McGraw nor Ms. Lobel advised Ms. Robinson that the restructuring included a newly created position that combined the duties previously performed by Ms. Robinson and Ms. Nale.

67. Ms. Robinson was never informed that OAG intended to post the new Human Relations Specialist position online.

68. Ms. McGraw admitted that even if Ms. Robinson had applied

for the new position, she would not have been hired.

69.    Ms. Robinson did not become aware of the new position until after she learned that a new employee had already been hired for the job.

70.    Three days prior to Ms. Robinson's termination, Ms. McGraw prepared Ms. Robinson's annual performance evaluation for the period July 1, 2019, to June 30, 2020 ("2020 Evaluation"), signed by Ms. Lobel as a reviewer on April 12, 2021. Ms. Robinson never received the 2020 Evaluation.

71.    Ms. Robinson received an overall rating of "Satisfactory" in the 2020 Evaluation.

72.    OAG issued a job posting for the new position on April 19, 2021.

73.    Ms. Robinson had performed many of the duties listed as "Examples of Duties" in the new position's posting, as those duties were performed in her previous position.

74.    By June 15, 2021, OAG decided to hire Vania Tonelotti for the new Human Resources Analyst III position.

75.    The position was offered to Ms. Tonelotti on June 22, 2021, and she was officially appointed by then Attorney General Josh Shapiro

on July 7, 2021.

76.  Ms. Tonelotti had previously worked for Ms. Lobel's friend as a babysitter when Ms. Tonelotti was twenty-one years old.

77.  Ms. Tonelotti had also previously worked at the Philadelphia District Attorney's ("PDA") Office with Ms. Lobel.

78.  In 2020, Ms. Lobel knew that Ms. Tonelotti was looking for a job because Ms. Tonelotti's boss was retiring and Ms. Tonelotti did not want to stay at the PDA's office.

79.  Ms. Lobel testified that she had Ms. Tonelotti in mind for the new position on December 16, 2020, prior to Ms. Robinson's termination.

80.  Ms. Tonelotti participated in two rounds of interviews before two groups of OAG panel members before she was hired.

81.  During the interview process, at least six panel members identified Ms. Tonelotti's lack of experience in some of the duties expected in the new Human Resources III position, specifically with labor relations duties or EEO matters.

82.  After her termination, Ms. Robinson could not afford to retire and had to search for a new job.

83.  Ms. Robinson applied for some open jobs in the following three

years after her termination to work at the Commonwealth of Pennsylvania: (1) Administrative Officer 3; (2) Educational Outreach Coordinator; (3) Human Resource Analyst General; (4) Administrative Officer Legislative Liaison; (5) Administrative Officer 2; (6) Career Development Coordinator; and (7) Regional Association and Recruitment Advisor. She was rejected for all positions.

84. Ms. Robinson applied for some open jobs in the private industry and in higher education in the three years after her termination. She was not hired for any private industry or higher education job for which she applied.

85. In the spring of 2024, Ms. Robinson applied for a job with Kelly Services USA, working as a permanent substitute teacher at the Harrisburg School District.

86. Ms. Robinson was hired as a substitute teacher in April 2024.

87. Ms. Robinson exercised some reasonable diligence in finding employment between her job at OAG and her hiring as a substitute teacher.

88. As of 2021, Ms. Robinson earned a salary of $73,780.00 at OAG, plus employment benefits, including a pension that increases based

on years of service and salary.

89.    As a substitute teacher, Ms. Robinson earns $225.00 per day worked. She is not paid for school holidays and does not get paid during the summer. Her job also has no employment benefits.

90.    Ms. Robinson testified that her termination forced her to take early social security benefits at age sixty-two and elect to commence receiving lower pension benefits from the State.

## B. Conclusions of Law

1.    Ms. Robinson alleges that OAG has discriminated against her based upon her race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII") and the Pennsylvania Human Relations Act, 43 P.S. § 955(a) ("PHRA"). Ms. Robinson additionally alleges that OAG discriminated against her based upon her age in violation of the PHRA.

2.    Under Title VII, it is an "unlawful employment practice for an employer to … discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race…." 42 U.S.C. § 2000e-2(a)(1).

3. The PHRA provides "[i]t shall be an unlawful discriminatory practice for any employer … because of race, color, … of any individual … to otherwise discriminate against such individual with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual is the best able and most competent to perform the services required." 43 P.S. § 955(a).

4. In the Third Circuit, "[c]laims under the PHRA are interpreted coextensively with Title VII claims." *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006); *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001).

5. A plaintiff is not required to demonstrate direct proof of discrimination as intent can be inferred with respect to certain conduct. *Abramson v. William Paterson Coll. of New Jersey*, 260 F.3d 265, 278 (3d Cir. 2001).

6. Race discrimination and age discrimination claims require the application of the *McDonnell Douglas* burden-shifting framework test. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 802 (1973). First, a plaintiff must show a *prima facie* case of discrimination. *Id.* Next, if the plaintiff succeeds, the burden shifts to the defendant to "articulate

some legitimate, nondiscriminatory reason for the employee's [action]." *Id.* Finally, if the defendant satisfies its burden, the plaintiff must introduce evidence that the legitimate reasons offered by the defendant were a pretext for discrimination. *Id.*

7.   Under the first step of *McDonnell Douglas*, a plaintiff must establish a *prima facie* case of discrimination by showing that: (1) she was a member of a protected class; (2) she was qualified for the position at issue; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *Daniels v. Sch. Dist. of Philadelphia*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013), *aff'd*, 776 F.3d 181 (3d Cir. 2015).

8.   In the context of a restructure due to a reduction-in-force, the fourth element may be satisfied with evidence that the defendant "retained employees not within the protected class." *Smith v. Thomas Jefferson Univ.*, No. 05-2834, 2006 WL 1887984, at *3 (E.D. Pa. June 29. 2006).

9.   Persons outside the protected class are those employees who are "similarly situated," that is, they work in the same area in approximately the same position. *Anderson Consol. Rail Corp.*, 297 F.3d

242, 249–50 (3d Cir. 2002).

10. Here, the remaining six Human Resource analysts retained by OAG after the plaintiff's and Ms. Nale's terminations are the "similarly situated parties."

11. Ms. Robinson has not satisfied the first step of *McDonnell Douglas* for her race and age discrimination claims for OAG's concealment of the new job posting because the concealment of the new job posting does not constitute an adverse employment action.

12. Ms. Robinson has satisfied the first step of *McDonnell Douglas* for both her race and age discrimination claims for her termination.

13. Ms. Robinson's race discrimination claims for her termination satisfy the first step of *McDonnell Douglas* as she: (1) is African American; (2) qualified for the new Human Resource Analyst III position, which contained duties that she successfully performed during her career at OAG and others that she was familiar with based upon her twenty-one-year career at OAG; (3) suffered an adverse employment action in the form of the termination of her employment; and (4) was terminated while OAG retained the remaining Caucasian members of her Human

Resources division.

14. Ms. Robinson's age discrimination claim for her termination satisfy the first step of *McDonnell Douglas* as she: (1) is over forty years of age; (2) qualified for the new Human Resource Analyst III position, which contained duties that she successfully performed during her career at OAG and others that she was familiar with based upon her twenty-one-year career at OAG; (3) suffered an adverse employment action in the form of the termination of her employment; and (4) was terminated while OAG retained the remaining younger members of her Human Resources division.

15. OAG's legitimate nondiscriminatory reason for the plaintiff's termination and its purposeful concealment of the newly consolidated position satisfies the second step of *McDonnell Douglas* for the plaintiff's race and age discrimination claims.

16. OAG's reasoning that the plaintiff was terminated as part of a restructuring of the Human Resources division and concealment of the new Human Resources Analyst III position due to her struggling work and problematic fit performance constitute legitimate nondiscriminatory reasons.

17. Ms. Robinson has satisfied the third step of *McDonnell Douglas* by introducing evidence that the legitimate reasons offered by OAG for her termination were a pretext for discrimination.

18. To establish pretext, a plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Iadimarco v. Runyon*, 190 F.3d 151, 166 (3d Cir. 1999) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

19. The plaintiff must "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a factfinder could rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 764.

20. Here, Ms. Robinson has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in OAG's proffered legitimate reasons for its actions that we find them unworthy of credence and constitute a pretext for discrimination.

21. Ms. Robinson received "Satisfactory" or "Commendable" annual performance evaluation reports throughout her employment in every rating criteria, yet Ms. Robinson was terminated and not permitted to apply for the new Human Resources Analyst III position which contained some of her former duties and other duties with which she was familiar based upon her twenty-one years of experience at OAG.

22. Accordingly, pretext is established as OAG claims that Ms. Robinson could not adequately perform her job, and that her job performance constituted a reason for her termination and determination that she could not adequately perform the new Human Resources Analyst III position. However, Ms. Robinson's ratings in every annual performance evaluation category were "Satisfactory" or "Commendable."

23. Pretext is established when OAG claims that there were significant concerns about Ms. Robinson's overall work performance, but she was never issued any discipline under OAG's Employee Disciplinary Policy and never was issued a 90-day Performance Improvement Plan.

24. Pretext is established when OAG claims there were significant concerns about Ms. Robinson's overall work performance, but Ms. McGraw and Ms. Lobel left many positive comments commending

Ms. Robinson for her work performance in her annual performance evaluations.

25. Pretext is established when Ms. Robinson, the oldest and only African American employee in her division, was relocated and separated away from the remainder of her team.

26. Pretext is established when Ms. Robinson was not permitted to investigate Mr. Rainey's race discrimination complaint, even after Ms. Robinson followed up with her supervisors about next steps in the investigation process.

27. Pretext is established when Ms. Lobel considered terminating Mr. Rainey's employment due to a potential restructuring of the mailroom after Mr. Rainey filed the race discrimination complaint.

28. Pretext is established when OAG hired Ms. Tonelotti for the new Human Resource Analyst III position despite having no experience with many of the duties needed for the position.

29. Pretext is established when OAG hired Ms. Tonelotti for the new Human Resource Analyst III position despite claiming that Ms. Robinson's inexperience with some duties of the position made her a bad fit.

30.  Pretext is established when after twenty-one years of service at OAG, Ms. Robinson was terminated before she was eligible for the Commonwealth's superannuation retirement system.

31.  OAG's stated reasons for both terminating Ms. Robinson and purposefully concealing from her the posting of the new Human Resources Analyst III position are therefore not credible in light of substantial evidence of pretext. We conclude that Ms. Robinson was discriminated against based on her race in violation of Title VII and the PHRA, and discriminated against based on her age in violation of the PHRA.

32. Title VII authorizes a back pay award as a remedy for intentional discrimination. 42 U.S.C. § 2000e-5(g); *Loeffler v. Frank*, 486 U.S. 549, 558 (1988).

33.  Back pay is also a remedy for age discrimination. *Anastasio v. Schering Corp.*, 838 F.2d 701, 708 (3d. Cir. 1988).

34. Backpay is a discretionary remedy under Title VII even though it "should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole of

injuries suffered through past discrimination." *Maxfield v. Sinclair Int'l.*, 766 F.2d 788, 795 n.5 (3d Cir. 1985) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975)).

35.    Backpay awards are subject to mitigation and can be reduced by the amount the plaintiff could earn with "reasonable diligence." 42 U.S.C. § 2000e-5(g)(1).

36.    Based upon the testimony and evidence presented at trial, we find that the plaintiff is entitled to Back Pay of $52,349.45[11] for the year 2021 and $73,780.00[12] for the year 2022.

37.    Based upon the testimony and evidence presented at trial, we find that the plaintiff is not entitled to Back Pay for the years 2023, 2024, and 2025, as we are unpersuaded that the plaintiff exercised "reasonable diligence" in finding employment to mitigate her damages for those years.

38.    The plaintiff's receipt of Social Security benefits is immaterial

---

[11] This determination is based one the remaining thirty-seven weeks that the plaintiff would have worked in her position at OAG based on her annual salary of $73,780.00.

[12] This determination is based on the fifty-two weeks that the plaintiff would have worked in her position at OAG based on her annual salary of $73,780.00.

to the Back Pay award as Social Security benefits are collateral source benefits which do not ordinarily set off a back pay award. *Maxfield v. Sinclair Int'l*, 766 F.2d 793, 794 (3d Cir. 1985).

39. The plaintiff's receipt of unemployment compensation benefits is immaterial to the Back Pay award as unemployment compensation benefits are collateral source benefits which do not set off a back pay award. *McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214, 217 (3d Cir. 1984, *vacated and remanded on other grounds*, 469 U.S. 1202 (1985); *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 85 (3d Cir. 1983).

40. The plaintiff's receipt of pension benefits is immaterial to the Back Pay award as pension benefits are an integral part of an employee's compensation package, considered collateral benefits, and not an offset to a Back Pay award. *Blum v. Witco Chemical Corp.*, 829 F. 2d 367, 375 (3d Cir. 1987).

41. Front pay is a remedy that substitutes for reinstatement, and is awarded when reinstatement is not viable under the circumstances. *Donlin v. Philips Lightning N. Am. Corp.*, 581 F.3d 73, 86 (3d Cir. 2009); *Berndt v. Kaiser Aluminum & Chem. Sales, Inc.*, 789 F.2d 253, 261 (3d Cir. 1986).

42. Courts consider the following facts in examining a front pay award: (1) plaintiff's potential future in the position; (2) her work and life expectancy; (3) her duty to mitigate damages; (4) the availability of similar jobs and the time needed to find substitute work; (5) discount tables for the present value of future damages; and (6) other factors relevant to prospective damage awards. *Andujar v. Gen. Nutrition Corp.*, 767 F. App'x 238, 243 (3d Cir. 2019).

43. Front pay is awarded for a "reasonable future period required for the victim to reestablish [her] rightful place in the job market." *Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 889 (3d Cir. 1984).

44. The absence of expert testimony does not prevent the fact finder from rendering a front pay award. *Paolella v. Browning-Ferris, Inc.*, 158 F.3d 183, 195 (3d Cir. 1998).

45. Reinstatement of the plaintiff to a job at OAG is impractical as there is no evidence that OAG has an open position for the plaintiff to fill.

46. Based on the testimony and evidence presented at trial, we find that the plaintiff is entitled to front pay in the amount of $33,280.00 ($73,780.00 OAG salary less $40,500.00 – 36 week annual work year as

a substitute teacher at $1,125.00 weekly).

47. Title VII allows recovery of compensatory damages for any pain, suffering, inconvenience, mental anguish, or loss of enjoyment of life a plaintiff experiences as a consequence of unlawful discrimination. 42 U.S.C. § 1981a(a)(1); *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 847 (2001).

48. Compensatory damages may also be awarded for emotional distress under the PHRA. *Brown Transp. Corp. v. Com., Pennsylvania Hum. Rels. Comm'n*, 578 A.2d 555, 562 (Pa. Cmwlth. 1990).

49. Under Title VII, the award of compensatory damages is capped at $300,000.00 for employers with more than 500 employees. 42 U.S.C. § 1981a(b)(3).

50. Based on the testimony and evidence presented at trial, we find that the plaintiff is entitled to $50,000 in compensatory damages.

51. A prevailing party in a Title VII case may recover reasonable attorneys' fees. 42 U.S.C. § 2000e-5(k); *EEOC v. L.B. Foster Co.*, 123 F.3d 746, 750 (3d Cir. 1997).

52. The court may also award the prevailing party attorneys' fees in a PHRA claim. 43 P.S. § 962(c)(2).

53. Following the Court's entry of judgment, the Court will permit the plaintiff to file a petition for the award of attorneys' fees and costs.

## V.    Conclusion

For the foregoing reasons, we will direct the clerk to enter judgment in favor of the plaintiff and against OAG on all counts of the plaintiff's complaint.

An appropriate order follows.

Dated: April 27, 2026                    *s/Joseph F. Saporito, Jr.*
                                          JOSEPH F. SAPORITO, JR.
                                          United States District Judge